

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **JARRIOD SCOTT** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **Case No. 4:11CV728** |
| | § | |
| **WEBER AIRCRAFT** | § | |
| | § | |
| **Defendant.** | § | |

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

Pending before the Court is Defendant Weber Aircraft LLC's Motion for Summary Judgment (Dkt. 52 ).  As set forth below, the Court finds that the Motion should be GRANTED.

### FACTUAL BACKGROUND

Plaintiff began his employment with Weber on or about May 23, 2005.  Weber manufactures commercial aircraft seats for airlines and major aircraft manufacturers from its primary manufacturing facility in Gainesville, Texas.  During his employment with Defendant, Plaintiff (Scott) worked as an "Assembler," making aircraft seats out of component parts.   Scott's employment was subject to a collective bargaining agreement ("CBA") between Weber and the General Warehousemen and Helpers, Local 767, Affiliated with International Brotherhood of Teamsters (the "Union").  The CBA identifies some, but not all, of the causes for which Defendant may be forced to take disciplinary action, including "Category 1" rule violations which result in immediate suspension pending investigation/probable discharge.  "Committing any act of violence, fighting, serious horseplay or improper conduct on Company premises" is a Category 1 rule

1

violation.

Scott's employment with Weber was terminated on or about April 12, 2011.  According to Weber, it terminated Scott's employment for the Category 1 violation of "[c]ommitting any act of violence, fighting, serious horseplay or improper conduct on Company premises."  Prior to his termination, Scott's immediate supervisor was Lucian Vaughn (Vaughn"), Fabrication Supervisor. At all times relevant to this lawsuit, Vaughn reported to Terry Cason ("Cason"), Fabrication Manager, and Cason reported to Dane Coker ("Coker"), Senior Fabrication Manager. Scott directly reported to Vaughn for an approximate six-month period prior to his termination.  Before his supervision was changed to Vaughn, Scott reported to Ricky Huddleston ("Huddleston").

Scott is an African-American.  Scott contends that, in 2006, while working on the assembly line, a fellow employee brought to Scott's attention a "noose" made of white cleaning towels.  This noose was allegedly hanging from the front part of the assembly line.  Scott worked at the end of the assembly line.

Weber contends that Scott waited three days to see if his supervisor would notice and take any action before reporting the noose.  After three days, Scott reported the noose for the first time to his then-supervisor, Wayne Lindsey ("Lindsey").   In response, Lindsey immediately took the noose down and threw it away.  Scott did not observe Lindsey take any notes or make any reports about the noose, but does not know one way or the other if Lindsey did in fact make any reports regarding Scott's complaint.

Scott filed a grievance concerning his perception that Lindsey inappropriately handled his noose complaint.  As a result, Scott attended a meeting with a production manager and a Union steward.  At this meeting, Scott expressed his opinion that Lindsey's employment should be

2

terminated or, alternatively, Lindsey should be suspended.   The management official present did not accept Scott's suggestion.

In February 2010, a fellow employee brought to Scott's attention an outside, third-party circular containing the "n-word" that had been found on Weber's property.   According to Weber, this outside, third-party circular had not been published, distributed, or in any way approved by Weber.   In fact, it was never determined how the outside, third-party circular ended up at the Gainesville plant, but it is assumed that it was brought onsite by an employee of the company without permission.  Because this outside, third-party circular had been brought to Scott's attention early in the morning, no Human Resources representatives were yet present at the Gainesville plant. Instead, Scott addressed his concerns with Union steward Glen Gregory ("Gregory").   Gregory's response was to bring Scott's concerns to Human Resources Manager Elizabeth Huchton ("Huchton"), and Scott was able to meet with Huchton within two to three hours.

After Scott expressed his concerns to Huchton, Huchton assured Scott that she would send an e-mail to all supervisors and post a sign indicating that all outside, third-party documents must be cleared by Human Resources before they can be brought into the facility, and that she would ensure that all copies of the outside, third-party circular at issue would be removed from the break rooms.  After making this complaint to Human Resources, Scott in fact observed Weber personnel checking the Weber break room for unauthorized material.

On February 16, 2010, Huchton e-mailed all supervisors, stating that the outside, third-party circular at issue and any other non-Weber publications are not allowed to be distributed at the Weber facility, and that all outside postings or publications must be approved by Human Resources before posting or distribution.  Following his report to Human Resources regarding this outside, third-party

3

circular, Scott contends that management officials, and lead employees at the direction of management, increased their surveillance of Scott.

Next, Scott contends that on or around March 4, 2011, he was "physically assaulted by a motor vehicle" in Weber's parking lot.  As Scott was leaving the building following his shift, he was looking at his phone while walking to his car through a Weber parking lot.   A vehicle that had been previously parked was driving through that parking lot, and "grazed [Scott] with her vehicle." When Scott saw that he "was fixing to be hit," he "pushed away from her and . . . deflected her vehicle."  The only alleged contact between Scott and the vehicle was on the palms of Scott's hands, and Weber contends that the alleged contact was initiated by Scott himself.  Scott had no previous or subsequent interactions with this employee, and has no knowledge one way or the other as to this employee's motivation (or lack thereof) in driving her vehicle near Scott.  This employee made no verbal remarks to Scott and made no outward indication that Scott's race motivated her actions.

Scott reported this incident to Human Resources, and a Human Resources representative called the police.  This incident  occurred on a Friday, and the following Monday or Tuesday, Scott provided Huchton with the license plate number of the vehicle he claims hit him.  In response, Huchton gave Scott the automobile insurance information for the employee who owned that vehicle so that Scott could file an insurance claim.

Scott subsequently filed a workers' compensation claim with respect to his alleged injury. This claim was denied based on lack of evidence that any such injury or incident  occurred.  At some other point in his employment, Scott contends that an individual named "Roy" videotaped him in Weber's parking lot.  Scott observed Roy holding a small device that Scott believed to be either a cell phone or a camera.   Scott could not determine whether Roy was taking video or still

photographs, and Scott never saw any resulting video or photographs allegedly taken.  The next day, Scott again observed Roy in the parking lot and confronted Roy about his alleged behavior from the previous day.   Roy responded that Scott had been watching Roy's wife, which Scott denied.  Scott challenged Roy that "we can take care of it now."

After this second interaction with Roy, Scott communicated his concerns to Human Resources.  When asked by Huchton, Scott could not identify the person he claims videotaped him. Further, Scott was unaware of whether or not this person was a Weber employee.  Scott also contends that, when walking through the parking lot after leaving work at the end of his shifts, other Weber employees would start their vehicles and pass in front of and behind Scott when driving away. Scott reported this behavior to a Union steward, a fellow hourly employee, and is unaware whether this steward reported Scott's concerns to management.  When Scott later reported this behavior to Vaughn, Vaughn did accompany Scott to the parking lot to observe this alleged behavior; however, no out of the ordinary behavior was observed by Scott or Vaughn at this time.

On another occasion, a co-worker pointed his finger at Scott, in Scott's opinion, "like he was fixing to pull a trigger."   When speaking with Human Resources about this interaction, Scott could not state the name of this individual or identify him beyond "an older gentleman."   Scott believes that this pointing incident was racially motivated because the individual at issue allegedly knew nothing about Scott other than his skin color.

Finally, Scott contends that his supervisors and the lead employees over his areas monitored his behavior.  On August 5, 2010, a female employee reported to Human Resources that Scott had been staring at her and, on that day, had touched her backside.   Two other employees reported that they had observed Scott bump into this employee.  On  November 16, 2010, a female employee

5

reported to her supervisor her belief that Scott had been watching her and two other female employees.  This employee also reported that, after she had unsuccessfully looked for cleaning products in Scott's area, Scott accused her of coming into his area solely to stare at him.  On March 28 and 31, 2011, a female employee reported to Human Resources that Scott had been harassing her for one year, including pulling up to her vehicle in the parking lot and staring at her.  On April 1, 2011, a female employee reported to Human Resources that Scott had approached her to ask questions about "that bitch," referring to another female employee working in her area.

A male employee reported to Human Resources that Scott had stared at him on multiple occasions on March 31, April 1, and April 6, 2011, and that, on April 6, 2011, Scott approached this employee in the break room and sat directly across from him while continuing to stare.  On April 7, 2011, a male employee reported to Human Resources that, the previous day, Scott was staring at him while the employee was using the restroom.

On Friday, April 8, 2011, Scott was issued a warning for intimidating and improper conduct, as reported by multiple co-workers.  At a meeting with Vaughn, Cason, and two Union stewards, Scott was handed an Employee Performance Notice detailing the multiple complaints that had been made against him.  The Employee Performance Notice stated, in part:

> This is your final warning. Any further behavior of staring at employees, invading an employee's personal space, making statements that are improper and intimidating, or any other improper or intimidating behavior will result in disciplinary action up to and including termination.

At the April 8, 2011, meeting, Scott was aware that he was receiving a final warning.  On Monday, April 11, 2011, Scott reported to Vaughn that he felt he had been nearly hit by a vehicle in the parking lot that morning.  Vaughn reported Scott's complaint to Human Resources, and that

6

afternoon, Scott attended a meeting with Huchton, Vaughn, and a Union steward.  According to Weber, at this meeting, Scott and Huchton addressed each item on Scott's April 8, 2011, final warning in detail.  During this conversation, Scott frequently leaned across the table at Huchton, and his voice continued to increase in volume to the point of shouting.  When addressing the allegation that he had called a co-worker "that bitch," Weber claims that Scott increased his volume and turned to Huchton when repeating the word "bitch."

According to Weber, in response to the numerous complaints that Scott had stared at other employees in an intimidating manner, Scott responded, "Well, if that's the case, there's several individuals who were . . . staring at [him]."  Following this meeting, Huchton reported that she did not feel safe working in the same building as Scott.  On April 12, 2011, two female employees reported to Human Resources that, on the previous day, Scott had asked for their names in a manner that made them feel as if Scott were targeting them for something.  These employees also reported that Scott frequently stared at other employees at work.  On April 12, 2011, Scott's employment was terminated for repeated improper conduct following his receipt of a final warning.

Following his termination, Scott filed a grievance.  At the subsequent meeting to address Scott's grievance, Scott contends that Coker stated he had a video of Scott not being hit by a vehicle. Scott contends that in this statement, Coker was defaming Scott by implying that Scott lied about being hit by a vehicle.  Scott's grievance was denied.  Under the procedures agreed to by Weber and the Union, the final determination in the grievance process is made following an appeal to the Texas Cartage Grievance Board ("TCGB"), unless either the Union or Weber elects to proceed to arbitration instead.  The decision of the TCGB is final and binding on both parties.

Scott contends that he was defamed when his co-workers accused him of following them. Scott further contends that, following his termination, he has been monitored at his home.  Although he does not know who is conducting this alleged monitoring, Scott believes that Weber is responsible because, while Scott was driving near his home in Denton, Texas, he has seen vehicles with license plate frames reflecting a dealership with a sales location near Weber's facility in Gainesville, Texas.  Scott also contends that Weber hired a security company, International Security Company, to harass him and slander his name.  Scott holds this belief because International Security Company is allegedly based in Oklahoma or Wichita Falls, Texas, and when Scott goes places such as a local fast food restaurant, he sees license plate frames reflecting dealerships from those areas. Scott believes that individuals at the restaurant have been told something defamatory about him by International Security Company representatives because, when Scott enters the restaurant, people act "all penced up [sic] and tentative."  Scott contends that Weber is responsible for undercover agents of International Security Company following him because of the vehicles he sees with license plate frames reflecting dealerships from the Oklahoma and far North Texas area.

On May 11, 2011, Scott filed a Charge of Discrimination with the EEOC related to his employment with and discharge from Weber.  The EEOC found no cause to believe that Weber was in violation of any statutes implicated by Scott's Charge.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Hunt v. Cromartie*, 526 U.S. 541, 549, 119 S. Ct. 1545, 143 L. Ed.2d 731 (1999).  The appropriate inquiry is "whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986).

The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel,* 274 F.3d 984, 991 (5th Cir. 2001). In sustaining this burden, the movant must identify those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553, 91 L. Ed.2d 265 (1986). The moving party, however, "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant's burden is only to point out the absence of evidence supporting the nonmoving party's case. *Stults v. Conoco, Inc*., 76 F.3d 651, 655 (5th Cir. 1996).

In response, the nonmovant "may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255-57, 106 S. Ct. at 2513-14). Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record to show that there is a genuine issue for trial. *Stults*, 76 F.3d at 655. The citations to evidence must be specific, as the district court is not required to "scour the record" to determine whether the evidence raises a genuine issue of material fact. E.D. TEX. LOCAL R. CV-56(d). Neither "conclusory allegations" nor "unsubstantiated assertions" will

satisfy the nonmovant's burden.  *Stults,* 76 F.3d at 655.

**ANALYSIS**

Scott filed a complaint and an amended complaint.  Although not the model of clarity, both filings allege employment discrimination (race), retaliation, and harassment; defamation; disparate treatment; negligence, collusion with the Union, and breach of contract.  Defendant did not move to dismiss Plaintiff's claims but instead filed a motion for summary judgment.  Having reviewed the summary judgment record before it, the Court finds that Scott has failed to demonstrate a genuine issue of material facts as to any of his claims.

**Defamation**

Scott contends that Weber is liable for a statement made by its employee, Coker.  During the Union grievance hearing, Coker stated he had a video that showed that Scott was not hit by a vehicle as claimed.  Scott claims this is defamatory.  This statement is not defamatory.

Defamation is a false and injurious impression of a plaintiff published without legal excuse. *See Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 115 (Tex. 2000); *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex. 1995).  To maintain a defamation cause of action, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or with negligence, if the plaintiff was a private individual, regarding the truth of the statement.  *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex. 1998); *see also Neely v. Wilson,* __ S.W.3d __, 2013 WL 3240040, at *5 (Tex. June 28, 2013).  "[S]tatements that are not verifiable as false cannot form the basis of a defamation claim." *Neely,* __S.W.3d at __, 2013 WL 3240040, at *6 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21–22, 110 S.Ct. 2695,

10

2707, 111 L.Ed.2d 1 (1990)).  A statement is defamatory if the words tend to injure the plaintiff's reputation, exposing it to public hatred, contempt, ridicule, or financial injury, or if it tends to impeach the person's honesty, integrity, or virtue.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 73.001.  To qualify as defamatory, a statement should be derogatory, degrading, somewhat shocking, and contain elements of disgrace.  *Means v. ABCABCO, Inc.,* 315 S.W.3d 209, 214 (Tex. App.– Austin 2010, no pet.) (citing 1 Robert D. Sack, Sack on Defamation 2–17 (3d ed. 2009)).  But a communication that is merely unflattering, abusive, annoying, irksome, or embarrassing, or that only hurts the plaintiff's feelings, is not actionable.  *Id.*

An oral statement is defamatory *per se* only if it falls within one of the following categories: (1) imputation of a crime; (2) imputation of a loathsome disease; (3) injury to a person's office, business, profession, or calling; or (4) imputation of sexual misconduct.  *Gray v. HEB Food Store No. 4,* 941 S.W.2d 327, 329 (Tex.App. – Corpus Christi 1997, writ denied).

Plaintiff's purported evidence of a "he said-he said" statement does not even come close to creating a fact issue as to a defamatory statement.  Further, if the statement is only defamatory *per quod,* then the plaintiff must prove the existence and amount of damages.  *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.,* 219 S.W.3d 563, 580 (Tex.App. – Austin 2007, pet. denied) (citing *Bentley,* 94 S.W.3d at 604).  No such showing has been made by Scott even if the Court could grant all the liberality needed to twist what Coker said into a defamatory statement.

Moreover, the Court must determine whether a statement is reasonably capable of a defamatory meaning from the perspective of an ordinary person in light of the surrounding circumstances.  *See Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987).  Oral words, however opprobrious, are not actionable without proof of special damage, unless they impute

11

to another the commission of a crime or effect a person injuriously in his office, profession, or occupation. *See Mayo v. Goldman*, 57 Tex. Civ. App. 475,122 S.W. 449 (Tex. Civ. App. 1909, no writ). Scott's defamation claim fails and judgment should be granted in Defendant's favor.

## Breach of Contract (Collusion)

As to his breach of contract/collusion claim, Scott had no written contract with Weber. Weber had a contract with the Union (General Warehousemen and Helpers, Local 767). At best, Scott was a third-party beneficiary to the contract between Union and Weber. Article 8 of the CBA identified some actions for which discipline might occur. As noted above, Defendant's summary judgment evidence shows that a Category 1 rule violation included committing any act of violence, fighting, serious horseplay or improper conduct on Company premises. The CBA also provided for a grievance process for the employees. Any final determination in that process was to the Texas Cartage Grievance Board, unless either the employee or the Union elected arbitration.

The decision of the Board was final. Scott's termination was upheld. Scott has not demonstrated any act of collusion or breach of contract. His claim for collusion and breach of contract fail, and judgment should be rendered in Defendant's favor as to those allegations.

## Negligence

Scott also contends that Weber was negligent. His complaint is silent on how Weber was negligent but in an answer to interrogatories he claims Weber failed to attend to his personal safety in Weber's parking lot. In his Christine-ique[1] explanation, Scott contends that "cars would wait until he got in the parking lot to start there (sic) engines and either take off directly as he approached. Are (sic) come dangerously close after he passed." *See* Dkt. 52-8 at 4, Exhibit H to Defendant's Motion

---

[1]*See* CHRISTINE (Columbia Pictures 1983).

for Summary Judgment: Plaintiff's Answers to Defendant's First Set of Interrogatories.  Even if Scott could show some injury from cars chasing him in the lot, any claim lies exclusively in workers' compensation.  Since Weber was a subscriber, Scott needed to make a claim under the workers' compensation law.  *See* TEX. LAB. CODE ANN. § 408.001.  Judgment should be granted in Defendants' favor as to the negligence claim.

## Racial Discrimination

The Court turns next to Plaintiff's employment discrimination claims.  A plaintiff can establish a *prima facie* claim for racial discrimination under Title VII by showing that: (1) he is a member of a protected class; (2) he was qualified for the position at issue; (3) he was the subject of an adverse employment action; and (4) was replaced by someone outside of the protected class or in cases of disparate treatment, was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.  *Lee v. Kansas City S. Ry. Co.,* 574 F.3d 253, 259 (5th Cir. 2009) (citing *McDonnell Douglas,* 411 U.S. 792 at 802, 93 S.Ct. 1817); 42 U.S.C.A. §§ 2000e-2(a)(1), 2000e-3(a).

This Circuit applies the modified *McDonnell Douglas* approach in racial discrimination cases under Title VII.  As stated, Scott must first make a *prima facie* case of racial discrimination.  *Davis v. Dallas Area Rapid Transit,* 383 F.3d 309, 317 (5th Cir. 2004).  Then, Weber must articulate a legitimate, non-discriminatory reason for firing Scott.  *Id.*  If Weber provides a legitimate, non-discriminatory reason, the presumption of discrimination disappears.  *Id.*  Scott must then "offer sufficient evidence to create a genuine issue of material fact either (1) that [Weber's] reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that [Weber's] reason,

while true, is only one of the reasons for its conduct, and another 'motivating factor' is [Scott's]

protected characteristic (mixed-motives alternative)." *Rachid,* 376 F.3d at 312 (internal marks and

citation omitted).

Scott fails to make out a *prima facie* case. Weber acknowledges that Scott can meet the first

and third element of a discrimination claim. However, Weber contends that Scott cannot meet the

last element of a discrimination claim. The Court agrees.

First, Scott does not contend that he was replaced by a non- African-American employee.

There is also no evidence in the summary judgment record that would create a fact issue as to his

replacement. This is fatal to his pure discrimination claim.

In the Fifth Circuit, "[d]isparate-treatment discrimination addresses employment actions that

treat an employee worse than others based on the employee's race, color, religion, sex, or national

origin. In such disparate-treatment cases, proof and finding of discriminatory motive is required."

*Pacheo v. Mineta*, 448 F.3d 783,787 (5th Cir. 2006). Scott does not identify any similarly situated

employees who were treated differently. To be similarly situated, an employee must experience

different employment actions as the plaintiff under nearly identical circumstances. *See Lee v.*

*Kansas City Southern Ry. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009).

Plaintiff's response on this issue seems to center on a complaint that the Union did not do

more for him. Plaintiff also claims that a Caucasian employee videotaped him on company property

but was not disciplined. He also refers to an employee staring at him, but it is not clear if this was

the same employee or someone different. In sum, Scott contends that the company did not comply

with its own harassment policy when confronted with Scott's concerns for his safety.

14

In the Fifth Circuit, employment actions "will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. . . If the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated for the purposes of an employment discrimination analysis." *Id.* at 260.

Weber contends that Scott was terminated for repeated instances of improper, intimidating conduct, following multiple co-worker complaints and after the receipt of a final warning. Scott has alleged that various other employees stared at him but none have been identified. Scott has pointed to no evidence in the summary judgment record regarding what position the employees held or who their supervisors were at the least. Scott fails to show disparate treatment.

In any case, even if a *prima facie* case could be shown, Weber has articulated a valid non-discriminatory reason for firing Scott. Weber has met its burden to so demonstrate. Scott must prove that the proffered reason is not true but instead a pretext for the real purpose of discrimination. *See McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). He has not done so, and nothing in the summary judgment record creates a fact issue as to pretext. Scott's claim for racial discrimination fails.

## Hostile Work Environment

To establish a claim of hostile work environment under Title VII, Scott must prove that he (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment

15

complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir. 2002) Scott is a member of a protected group.  He contends that, during his employment, he observed a noose hanging from the assembly line and saw an outside third party circular which used the "n" word.  These isolated incidents are outside the relevant statute of limitations period.

Moreover, Scott reported these incidents, and, as to the circular, Weber took immediate and corrective action.  As to the noose incident, Scott waited three days to report it to his supervisor who immediately took the noose down.  Scott also complains about being videotaped, assaulted by a motor vehicle, and being stared at by co-workers.  Even if these complaints are true, there is no evidence to create a fact issue that that the actions were based on race.  A wide range of behaviors can make a workplace uncivil, but to prevail in his claim, Scott must demonstrate such actions were based on race. *Ramsey v. Henderson,* 286 F.3d 264, 268 (5th Cir. 2002) (citations omitted). Likewise, there is no evidence of any hostility to any other African-American employee which would tend to make Scott's claim more pervasive or persuasive. *See Hernandez v. Yellow Transp. Inc.*, 670 F.3d 644 (5th Cir. 2012).  Scott has failed to demonstrate a fact issue as to his hostile work environment claim, and he should take nothing by this claim.

### Retaliation

Next, the Court turns to Scott's retaliation claim.  In order to establish a *prima facie* case of retaliation under Title VII, Scott must show that (1) he engaged in activity protected by the statute, (2) an adverse employment action occurred, and (3) a causal link exists between the protected activity and the adverse employment action. *Evans v. City of Houston,* 246 F.3d 344, 352 (5th Cir.

16

2001).  As discussed above, if a plaintiff succeeds in establishing a *prima facie* case, the *McDonnell Douglas* burden shifting framework then applies.  *Id.* at 354.  For the *prima facie* case, a causal connection requires that the "employer's decision to terminate was based in part on knowledge of the employee's protected activity."  *Sherrod v. American Airlines, Inc.* 13 F.3d 1112,1122 (5th Cir. 1998).  Here, the only two events that could be interpreted as protected activity – the "noose" incident in 2006 and the third-party circular in February 2010 – occurred long before Plaintiff's April 2011 termination.  There is no "close temporal proximity" that may be sufficient to raise an issue of a *prima facie* case of retaliation.  *See Swanson v. Gen. Servs. Admin.* 110 F.3d 1180, 1188 (5th Cir. 1997).

Scott has claimed in his pleadings and in open court that Weber has conducted surveillance on him.  Yet, there is absolutely no evidence that this is true or even plausibly true.  Scott must come forward with more than a suspicion that license plates from a North Texas dealership may be the link to demonstrate the suspicion.  He has failed to create a genuine issue of material fact as to this allegation.

Nevertheless, even if Scott could demonstrate a *prima facie* case, he must still show that Weber's proffered reason for firing him was a not true but instead is a pretext for the real purpose of retaliation.  *See McCoy,* 492 F.3d at 556.  Weber's reason for firing Scott was for his odd, erratic, and offensive behavior.  He was given a warning and pursued his rights through appropriate channels.  In the end, his termination was upheld.  Scott's response creates no fact issue as to pretext for a jury to weigh.  His retaliation claim fails.

17

## RECOMMENDATION

The Court recommends that Defendant Weber Aircraft, LLC's Motion for Summary Judgment (Dkt. 52) be GRANTED in its entirety, that Plaintiff take nothing by his claims here, and that the matter be closed on the Court's docket.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge.   28 U.S.C.A. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 267-77 (5th Cir. 1988).

**SIGNED this 29th day of October, 2013.**

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE

18